CLERKS OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

MAR 05 2024

LAURA A. AUSTIN, CLERK
BY: s/ H. MCDONALD
        DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| SHERRY M., | ) | |
| Plaintiff, | ) | Civil Action No. 4:22-cv-00108 |
| | ) | |
| v. | ) | REPORT & RECOMMENDATION |
| | ) | |
| MARTIN O'MALLEY, | ) | By:    Joel C. Hoppe |
| Commissioner of Social Security, | ) | United States Magistrate Judge |
| Defendant. | ) | |

Plaintiff Sherry M. asks this Court to review the Commissioner of Social Security's

("Commissioner") final decision denying her claim for disability insurance benefits ("DIB")

under Title II of the Social Security Act, 42 U.S.C. §§ 401–434, after a prior federal court

remand, 42 U.S.C. 405(g). Compl., ECF No. 2; *see* Administrative Record ("R.") 500–03, ECF

No. 10. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the

administrative record, the parties' briefs, and the applicable law, I find that the denial of benefits

is not supported by substantial evidence in the record. Accordingly, I respectfully recommend

that the presiding District Judge reverse the Commissioner's final decision and remand the

matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final

decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v.*

*Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not

"reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for

that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court

reviewing the merits of the Commissioner's final decision asks only whether the Administrative

Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports

the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th

Cir. 2017); 20 C.F.R. § 404.1520(a)(4).[1] The claimant bears the burden of proof through step

four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the

claimant is not disabled. *See id.*

## II. Procedural History

In June 2018, Sherry filed for DIB alleging that she had been disabled since June 2016

because of fibromyalgia, polyarthritis, carpal tunnel syndrome, bursitis, cervicalgia, lower-back

pain, and hand and foot pain. *See* R. 148, 166. Sherry was forty-five years old, or a "younger

person" under the regulations, in June 2016. R. 86; 20 C.F.R. § 404.1563(c). Virginia Disability

Determination Services ("DDS") denied her claim initially in September 2018, R. 86–96, and

upon reconsideration in January 2019, R. 98–109. That August, Sherry appeared with counsel

and testified at a hearing before ALJ Monica Flynn. *See* R. 57–85. A vocational expert ("VE")

also testified about Sherry's past relevant work. *See* R. 78–83. ALJ Flynn issued an unfavorable

decision on October 1, 2019. R. 10–17. She concluded Sherry was not disabled after June 2016

because Sherry's residual functional capacity ("RFC") would allow her to do her past work as

"an accounts receivable clerk [or] an administrative clerk as generally and actually performed."

R. 17 (citing R. 63–64, 79–83); *see* 20 C.F.R. § 404.1560(b).

In September 2020, Sherry filed suit in this Court challenging ALJ Flynn's denial of

benefits. *See* R. 500–04 (No. 4:20cv58 (W.D. Va. filed Sept. 18, 2020)). At the Commissioner's

request, the presiding District Judge remanded the matter, R. 500–01, so an ALJ could further

evaluate Sherry's fibromyalgia in accordance with agency policy, R. 502 (citing SSR 12-2p). In

July 2021, the Appeals Council vacated ALJ Flynn's decision and sent Sherry's case to another

---

[1] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the
date of the Commissioner's final written decision.

ALJ to hold a hearing and issue a new written decision. R. 517–18. It instructed the next ALJ

that the "decision should . . . not rely on the objective findings to discount [Sherry's] symptom

allegations" related to fibromyalgia. R. 517; *accord Arakas v. Comm'r, Soc. Sec. Admin.*, 983

F.3d 83, 97 (4th Cir. 2020) ("Today, we . . . hold[] that ALJs may not rely on objective medical

evidence (or lack thereof)—even as just one of multiple factors—to discount a claimant's

subjective complaints regarding symptoms of fibromyalgia or some other disease that does not

produce such evidence.").

In January 2022, Sherry appeared with counsel and testified by telephone at a hearing

before ALJ Carol Moore. R. 449–83. Haddon Alexander, M.D., testified as a medical expert in

rheumatology and fibromyalgia. R. 453–66; *see* R. 872. A new VE also testified about Sherry's

past relevant work. R. 478–81. ALJ Moore issued an unfavorable decision on February 22, 2022.

R. 433–45. She found that Sherry had not worked since June 14, 2016, and that she met the Act's

insured-status requirements through December 31, 2019.[2] R. 436. Sherry had the following

"severe" medically determinable impairments ("MDIs") during this relevant period: degenerative

disc disease, fibromyalgia, arthritis, and obesity. *Id.* Her bursitis of the hips, carpal tunnel

syndrome, and a gastrointestinal condition were all "non-severe" impairments. *Id.* Sherry's

severe MDIs did not meet or medically equal the relevant Listings. *See* R. 436–37 (20 C.F.R. pt.

404, subpt. P, app. 1 §§ 1.15, 1.18; SSR 12-2p; SSR 19-02p).

---

[2] The latter date is called the date last insured, or "DLI." R. 436; *see Bird v. Comm'r of Soc. Sec. Admin.*, 699 F.3d 337, 341 (4th Cir. 2012). "To qualify for DIB, [Sherry] must prove that she became disabled prior to the expiration of her insured status." *Johnson*, 434 F.3d at 655–56. Thus, the relevant period for Sherry's DIB claim is June 14, 2016, through December 31, 2019. R. 436, 443; *see Tolbert v. Colvin*, No. 1:15cv437, 2016 WL 6956629, at *1 (M.D.N.C. Nov. 28, 2016). ALJ Moore was still required to consider all the relevant evidence in Sherry's record, including any evidence created after her DLI that offered some insight into how Sherry's medical condition from June 2016 through December 2019 affected her work-related functional capacities during that time. *See Bird*, 699 F.3d at 341–42; *Parker v. Berryhill*, 733 F. App'x 684, 697 (4th Cir. 2018).

Next, ALJ Moore evaluated Sherry's RFC during the relevant time. *See* R. 438–42. She found that Sherry could have done "light work"[3] as defined in the regulations including "sit, stand, and walk each for six hours [total] in an 8 hour day[,] but no more than 30 minutes at one time; after 30 minutes [Sherry] would need to shift positions with no loss in work productivity." R. 438. She could not have climbed ladders, ropes, or scaffolds, but could have "occasionally"[4] climbed ramps/stairs, stooped, kneeled, crouched, crawled, and "frequently"[5] handled and fingered small objects. *Id.* She also should have "avoid[ed] even moderate exposure" to extreme temperatures, wetness, humidity, vibrations, and hazards. *Id.*; *see generally* R. 440–42.

Finally, relying on the second VE's testimony, the ALJ found that Sherry's RFC would have allowed her to do her past relevant work as a "loan clerk" (DOT 205.367-022), either as Sherry actually did that job or as it is generally performed in the national economy. R. 442–43 (citing R. 478–80). Based on that finding, ALJ Moore concluded at step four that Sherry was not disabled from June 14, 2016, through December 31, 2019. R. 442–43. She did not reach an alternative conclusion at step five as to whether Sherry could have done other work existing in

---

[3] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. § 404.1567(b). A claimant who can meet these strength demands should "be considered capable of performing a full or wide range of light work," *id.*, only if he or she can also "stand or walk for up to six hours per [eight-hour] workday or 'sit most of the time with some pushing and pulling of arm or leg controls,'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)). ALJ Moore found that Sherry had "the ability to do substantially all of these activities," 20 C.F.R. § 404.1567(b), through her DLI. *See* R. 438 (finding that Sherry had the RFC "to perform light work as defined in . . . [§] 404.1567(b) with lifting and/or carrying up to 20 pounds occasionally and 10 pounds frequently [and to] sit, stand, and walk each for six hours [total] in an 8 hour day[,] but no more than 30 minutes at one time").

[4] "'Occasionally' means occurring from very little up to one-third of the time. . . . [and] should generally total no more than about 2 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *5 (Jan. 1, 1983); *see also* R. 91, 105.

[5] "'Frequent' means occurring from one-third to two-thirds of the time . . . [or] a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6; *see also* R. 91, 105.

the national economy based on her RFC and vocational profile. *See id.* The Appeals Council

declined to assume jurisdiction, R. 423–29, and this appeal followed.

## III. Discussion

Sherry's arguments focus on ALJ Moore's evaluation of her statements describing the

intensity, persistence, and limiting effects of pain and stiffness caused by severe fibromyalgia

and arthritis, R. 436; *see* R. 438–39, in determining she retained the RFC to do light work with

"frequent handling and fingering," R. 438; R. 440–41 (ALJ's symptoms analysis). *See* Pl.'s Br.

1–2, 8–13, 15–17, ECF No. 17.[6] First, she argues that the ALJ impermissibly relied on objective

medical evidence to discount her testimony describing how chronic widespread myofascial pain

and stiff, achy joints dramatically reduced her abilities to sit, stand, walk, and use her hands. *Id.*

at 8–10 (citing *Arakas*, 983 F.3d at 97). Second, she asserts that the ALJ ignored her testimony

describing minimal and sporadic activities of daily living ("ADLs") when concluding that

Sherry's reported ADLs both supported the ALJ's RFC finding, R. 442, and "would not be

consistent with greater limitation," R. 441. Pl.'s Br. 10–13 (citing *Brown v. Comm'r of Soc. Sec.*

*Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017)). Third, Sherry argues that the ALJ did not explain

how "examinations noting spinal and extremity tenderness," R. 442; *see also* R. 440, supported

her RFC finding that Sherry could have done tasks requiring frequent handling and fingering, R.

---

[6] Sherry also objects to the ALJ's conclusory discussion of her fibromyalgia at step three, R. 437, as well
as to the ALJ's failure to mention evidence indicating that Sherry had an MDI that caused "constant and
severe" urinary incontinence during the relevant time. Pl.'s Br. 17–18 (citing R. 276–79, 283, 346–47).
The Commissioner can revisit those two issues on remand. Additionally, although Sherry did not raise
this issue in her brief, I note that ALJ Moore's cursory medical-opinion analysis, R. 441–42; *see* R. 90–
93, 105–06, 455–66, 876–83, violates the governing regulation's mandatory "articulation requirements,"
20 C.F.R. § 404.1520c(b). *See generally* 20 C.F.R. § 404.1520c(b)–(c); *cf. Patterson v. Comm'r of Soc.
Sec. Admin.*, 846 F.3d 656, 661–62 (4th Cir. 2017) (concluding that an ALJ's failure to apply a
"regulation with mandatory language" will rarely, if ever, be harmless error because "such a failure
prevents, or at least substantially hinders, judicial review").

438. *See* Pl.'s Br. 15–17 (citing *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018)). She also

asserts that the ALJ ignored objective medical evidence tending to support her allegations that

chronic pain and joint stiffness in both hands would have caused greater, potentially work-

preclusive manipulative limitations before her DLI, R. 442–43. *See* Pl.'s Br. 16–17 (citing R.

455). All three arguments are persuasive. *See generally Arakas*, 983 F.3d at 96–98; *Brown*, 873

F.3d at 269–70; *Woods*, 888 F.3d at 694–95, *superseded on other grounds as recognized in*

*Rogers v. Kijakazi*, 62 F.4th 872 (4th Cir. 2023).

A.      *The ALJ's RFC Finding*

        A claimant's RFC is her "maximum remaining ability to do sustained work activities in

an ordinary work setting" for eight hours a day, five days a week despite her MDIs and related

symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual

finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller*

*v. Astrue*, 459 F. App'x 266, 230–31 (4th Cir. 2011), including objective medical evidence and

the claimant's own statements describing her medical condition, 20 C.F.R. § 404.1545(a), (e).

*See Patterson*, 846 F.3d at 659 (noting that the "RFC assessment is a holistic and fact-specific

evaluation" made after the ALJ "evaluate[s] all relevant record evidence" (quotation marks

omitted)). The ALJ's RFC finding should reflect all credibly established "restrictions caused by

medical impairments and their related symptoms" that impact the claimant's functional "capacity

to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p,

1996 WL 374184, at *1–2; *see Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015).

        The Commissioner "has specified the manner in which an ALJ should assess a claimant's

RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by

definition "a function-by-function assessment based upon all of the relevant evidence of [the

claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ

must adequately summarize this evidence and identify each MDI-related functional limitation

supported by the record. *See Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the

ALJ must provide a "narrative discussion describing" how specific medical facts and non-

medical evidence logically "support[] each conclusion" in the RFC determination, SSR 96-8p,

1996 WL 374184, at *7, and explaining how she considered any conflicting or inconsistent

evidence in arriving at those conclusions. *Thomas*, 916 F.3d at 311. A reviewing court should

affirm the RFC determination when the ALJ considered all relevant evidence under the correct

legal standards, *see Brown*, 873 F.3d at 268–72, and her written decision "build[s] an accurate

and logical bridge from the evidence [s]he recounted to [her] conclusion about" the claimant's

RFC, *Woods*, 888 F.3d at 694. *See, e.g.*, *Shinaberry v. Saul*, 952 F.3d 113, 123 (4th Cir. 2020).

ALJ Moore's conclusory RFC analysis, R. 440–42, does not meet these minimum

standards. To start, her discussion "goes straight from listing evidence to stating a conclusion"

about Sherry's RFC. *Thomas*, 916 F.3d at 311. She concluded that Sherry could sustain all the

strength, postural, and manipulative demands of work reflected in her RFC finding, R. 440; *see*

R. 438; 20 C.F.R. § 404.1545(b), and "summarized evidence that [s]he found credible, useful,

and consistent" with her conclusion, *Woods*, 888 F.3d at 964. *See* R. 440–42. More specifically,

the ALJ cited Sherry's testimony and objective medical evidence showing

> that she did not require an assistive device for ambulation and she consistently
> exhibited normal gait and station with full strength, range of motion, and sensation,
> and no signs of distress, *which supports finding her capable* of lifting, carrying,
> sitting, standing, and walking at the light level and occasional climbing
> [ramps/stairs], stooping, kneeling, crouching, and crawling. ([R. 242–43, 254–55,
> 258–59, 348, 353, 372, 416–21]). These findings *are further supported by* her
> largely normal shoulder, spinal, hand, and foot imaging throughout the period at
> issue. ([R. 413, 766–67]).
>
> [Sherry's] complaints of pain and sensitivity and examinations showing spinal
> tenderness to palpations *support finding* she would require the flexibility to change

> position every 30 minutes with no loss of productivity; could perform no more than frequent handling and fingering; could never climb ladders, ropes, and scaffolds; and should avoid even moderate exposure to temperature extremes, wetness, humidity, vibrations, and hazards; *however*, her otherwise unremarkable findings and her statements regarding her ability to manage personal care independently, prepare meals, do dishes and laundry, shop for groceries, and do paperwork *would not be consistent with greater limitation*. ([R. 186–93]).

R. 440 (emphasis and line break added); *see also* R. 441–42. "But the ALJ never explained how [s]he concluded—*based on this evidence*—that [Sherry] could actually perform," *Woods*, 888 F.3d at 694, all the functions in her RFC finding, such as lifting 20 pounds at one time; sitting, standing, and walking each for six hours total during an eight-hour day; and "frequently" using both hands/fingers, R. 438. *See* SSR 85-15, 1985 WL 56867, at *7 (Jan. 1, 1985).

For example, "frequent handling and fingering" would require Sherry to use her hands and fingers to do tasks requiring fine manual dexterity for "one-third to two-thirds of the time . . . [or] a total of approximately 6 hours of an 8-hour workday." SSR 83-10, 1983 WL 31251, at *6; *see also* R. 91, 105. The ALJ did not explain how Sherry's reported lower-back pain or exams documenting tenderness to palpation of her cervical and lumbar spine, R. 242–43, 254–55, 258–59, 353, 372, 418, 420, were relevant to Sherry's ability to use her hands and fingers. *Cf. Lewis*, 858 F.3d at 869 (reversing and remanding in part because the ALJ did not explain how claimant's "normal gait bears any nexus to her complaint of chronic shoulder pain" or "to the functional limitations [she] suffered as a result of her chronic, non-exertional pain in her left shoulder"). Moreover, Sherry's purported "ability to manage her personal care independently, prepare meals, do dishes and laundry, walk pets, shop for groceries, and do paperwork," R. 440–41, does not mean that she could have sustained full-time work despite her chronic pain and joint stiffness. *See Oakes*, 70 F.4th at 216; *Arakas*, 983 F.3d at 101. The ALJ failed to explain why she concluded otherwise. *See* R. 441–42.

ALJ Moore also appears to have ignored medical evidence suggesting that Sherry could not have sustained work requiring frequent handling and fingering. *See* Pl.'s Br. 16–17 (citing R. 455); *see also* R. 255, 259, 263–64, 348, 372, 419, 421. ALJs evaluating disability claims must "consider all relevant medical evidence and cannot simply cherry pick facts that support a finding of nondisability while ignoring evidence that points to a disability finding." *Arakas*, 983 F.3d at 98. ALJ Moore denied Sherry's DIB claim at step four because, relying on the second VE's testimony, she found that Sherry's RFC allowed her to go back to work as a loan clerk (DOT 205.367-022), either as Sherry actually did that job or as it is usually performed in the national economy. R. 442–43 (citing R. 478–80). This VE did testify to that effect, R. 478–80, but she did not explain how she concluded that someone could be a loan clerk as Sherry actually performed that job if the person were limited to "frequent" handling and fingering. *See generally Prim v. Astrue*, No. 7:07cv213, 2008 WL 444537, at *6–8 (W.D. Va. Feb. 13, 2008) (explaining that an ALJ must make specific factual findings about the past job's actual physical and mental demands and that substantial evidence will not support a denial of benefits at step four "when an ALJ simply delegates his fact finding responsibilities to a VE"). In her job report, Sherry averred that her work at the loan company required her to write, type, or handle small objects—that is, to use her hands and fingers—for a total of seven hours during an eight-hour workday. R. 178. The Commissioner's policies would define this portion of the workday as "constantly," meaning the activity is done for "2/3 or more of the time." *See, e.g.*, *Arguello v. Saul*, No. 4:19cv42, 2020 WL 1301654, at *10 n.12 (E.D. Va. Mar. 2, 2020) (citing U.S. Dep't of Labor, Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles (1993)), *adopted*, 2020 WL 1290596 (E.D. Va. Mar. 18, 2020). The VE's "bare-bones testimony" notwithstanding, *Prim*, 2008 WL 444537, at *6, Sherry's undisputed job report shows that her

actual work as a loan officer required more than "frequent handling and fingering," R. 438, 442

(citing R. 479–80). Accordingly, substantial evidence does not support ALJ Moore's finding that

Sherry could return to her past relevant work as actually performed. *Prim*, 2008 WL 444537, at

*6–8; *see also Hines*, 453 F.3d at 566 ("The deference accorded an ALJ's findings of fact does

not mean that we credit even those findings contradicted by undisputed evidence.").

This Court could still affirm the Commissioner's denial of benefits if substantial evidence

supported ALJ Moore's finding that Sherry's RFC allowed her to work as a loan clerk as that job

is generally performed in the national economy. *See Goodman v. Astrue*, 539 F. Supp. 2d 849,

850 (W.D. Va. 2008). The VE indicated that being a loan clerk (DOT 205.367-022) typically

requires frequent handling *and* frequent fingering, meaning that Sherry must be able to sustain

*both* manual dexterity activities "from 1/3 to 2/3 of the time," DOT 205.367-022, *Credit Clerk*,

1991 WL 671717. *See* R. 478–80; *accord* R. 79–81, 83 (first VE's testimony that "occasional"

reaching and handling "would preclude all of [Sherry's] jobs from the past work"). Thus, any

further limitation on Sherry's ability to work with her hands or her fingers would eliminate the

ALJ's sole remaining reason for denying Sherry's disability claim. *See generally Patterson v.

Bowen*, 839 F.2d 221, 225 n.1 (4th Cir. 1988) ("We must . . . affirm the ALJ's decision only

upon the reasons he gave."). ALJ Moore appears to have ignored an entire line of medical

evidence that could support such restriction.

\*

Sherry has consistently reported that pain and stiffness in both hands limit her day-to-day

functioning. *See, e.g.*, R. 70–72, 76, 186–91, 193, 261, 346–47, 370, 418–21. In March 2017, her

primary care provider observed "scattered soft tissue nodules over the dorsal hands/knuckles on

both hands, but no severe swelling or warmth." R. 243. That July, Sherry reported "hurting all

over [for] 3–4 years," including in both hands. R. 270. Her gynecologist referred her to

rheumatologist Sharukh Shroff, M.D., to further evaluate widespread joint pain. *Id.*

Sherry established care with Dr. Shroff in October 2017. R. 252, 261–64. She reported

achy, stiff, painful joints in both hands. R. 261. Her "'hands hurt so bad, she can't use a blow

dryer for her hair'; severity of pain is 10/10 at its worse when she uses her hands and 4–5/10 at

its best when she rests her hands." *Id.* Dr. Shroff's physical exam findings were mostly

unremarkable, including normal range of motion without pain, swelling, or warmth in both

hands. R. 263. However, Sherry had a positive Bunnell's test and Heberden's Nodes were

present on her fingers bilaterally. *Id.*; *see* R. 264 (ultrasound results confirming Heberden's

Nodes in the hands). Dr. Shroff diagnosed Sherry with fibromyalgia and polyarthritis. He also

suspected that she had osteoarthritis in both hands owing to the abnormal physical exam findings

and her reported hand pain. *See* R. 264. An ultrasound revealed "mild inflammation" in the

second and third fingers bilaterally. *Id.* Sherry saw Dr. Shroff regarding her fibromyalgia and

arthritis symptoms three more times before her DLI. R. 253–56 (Nov. 29, 2017); R. 257–60 (Oct.

26, 2017); R. 370–73 (Oct. 6, 2018). Records from all three visits show that Sherry reported

severe pain and joint stiffness in both hands, R. 253, 257, 370, and that Dr. Shroff recorded

positive Bunnell's tests and Heberden's Nodes bilaterally, R. 255, 259, 372.

In May 2018, Sherry told her family physician that she had longstanding "achy,

throbbing pain" in her joints on both hands, worse in her dominant right hand. R. 346; *see* R.

737. She had "difficulty using her hands" because of pain and weakness. R. 346. Gahear Hamlor,

M.D., observed wrist tenderness, "redness and mild swelling [in the] DIP joints of both hands,"

and two "digit tips" that curved to the left. R. 348. He assessed "osteoarthritis of multiple joints:

chronic, not controlled." R. 349. Another provider noted Heberden's Nodes with arthropathy

bilaterally in February, March, and June 2019. *See* R. 419, 421, 674. In January 2022, Dr. Alexander testified that these nodes were "hard, firm lumps in the distal and phalangeal joints" on both of Sherry's hands. R. 455 ("These are confirmed by X-ray, as well as in several exams."). He opined that the nodes signaled a degenerative condition, namely loss of cartilage in the affected finger joints, rather than an inflammatory disease process. *See id.* Sherry also had positive Bunnell's tests, indicating reduced flexion proximally in the phalangeal joints. *See id.*

The ALJ summarized aspects of these same treatment notes, as well as Dr. Alexander's testimony, in her discussion of the medical-source evidence. *See* R. 439–40 (citing R. 243, 253–54, 257–64, 346–48, 354, 370–72, 418–21). Nowhere in her decision, however, did the ALJ acknowledge *any* of the medical evidence documenting specific anatomical abnormalities with associated pain and stiffness in Sherry's hands and fingers. *See generally* R. 436–42. Instead, she summarily concluded that Sherry's "complaints of pain and sensitivity" and exams showing "spinal tenderness to palpation" supported her RFC finding that Sherry "could perform no more than frequent handling and fingering," R. 440. Even if the ALJ had explained how she reached that conclusion, her "fail[ure] to consider an entire line of evidence," *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995), suggesting that Sherry had greater functional limitations makes it impossible for me to "gauge the propriety of the ALJ's RFC assessment," *Patterson*, 846 F.3d at 662. Thus, I "cannot say that substantial evidence supports the ALJ's denial of benefits." *Patterson*, 846 F.3d at 662.

B.    *Sherry's Symptoms*

The claimant's symptoms play a critical role in a proper RFC assessment. *See Mascio*, 780 F.3d at 636–37; 20 C.F.R. § 404.1529(a), (c). The regulations set out a two-step framework for ALJs to evaluate a claimant's symptoms. *Lewis*, 858 F.3d at 865–66; 20 C.F.R. § 404.1529.

"First, the ALJ looks for objective medical evidence showing a condition that could reasonably produce the alleged symptoms." *Lewis*, 858 F.3d at 866. Second, assuming the claimant clears the first step, "the ALJ must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's ability," *id.*, to work on a regular and continuing basis, *Mascio*, 780 F.3d at 639. The claimant's "symptoms, including pain, will be determined to diminish" her ability to work on that basis "to the extent that [the] alleged functional limitations and restrictions" resulting from those symptoms "can reasonably be accepted as consistent with the objective medical evidence and other evidence" in the record. *See* 20 C.F.R. § 404.1529(c)(4).

"The second determination requires the ALJ to assess the credibility of the claimant's statements about symptoms and their functional effects." *Lewis*, 858 F.3d at 866. In doing so, the ALJ must consider all the evidence in the record bearing on the claimant's allegations that she is disabled by pain or other symptoms caused by a medical impairment or related treatment. *See* 20 C.F.R. § 404.1529(c). This information can include objective medical evidence, like findings on exams or diagnostic studies; the claimant's daily activities; the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate symptoms; treatment, other than medications, the claimant receives or has received to manage symptoms; and any other measures the claimant uses or has used to relieve pain or other symptoms, like changing positions or lying down. *See id.* § 404.1529(c)(3). The ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements, *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5). Her articulated reason(s) for discounting a claimant's complaints of disabling pain or other symptoms need only be legally adequate and logically supported by the

evidence that she recounted. *See Arakas*, 983 F.3d at 97–98 (discussing legally impermissible

reasons in certain cases); *Brown*, 873 F.3d at 269 ("[T]he ALJ must build an accurate and logical

bridge from the evidence to his conclusion that the claimant's testimony was not credible."

(cleaned up)); *Dunn v. Colvin*, 607 F. App'x 264, 273–74 (4th Cir. 2005) (discussing legally

permissible reasons in most cases).

    *1.*     *Summary*

    Sherry alleges that she has been disabled since June 2016 because her fibromyalgia and

polyarthritis cause chronic moderate-to-severe widespread pain and stiffness. *See* R. 67–76, 186–

93, 469–77; *accord* R. 241, 253, 257, 261, 270, 346–47, 370, 418, 420, 673, 737 (reporting the

same to healthcare providers). Those symptoms impact most physical functions involving her

neck, lower back, feet, and hands. *See, e.g.*, R. 70–72, 76, 186–91, 193, 469–74; *accord* R. 253,

257, 261, 346–47, 370, 418–21 (reporting the same to healthcare providers).

    *a.*     *Treatment Records*

    Dr. Shroff treated Sherry in 2017 and 2018. *See* R. 252, 369. His findings on physical

exams were mostly within normal limits, including normal gait and station, full motor strength,

normal range of motion throughout, intact sensation, and no signs of "acute distress." R. 254–55,

258–59, 262–63, 371–72. Sherry's other providers observed similarly unremarkable findings on

their physical exams. R. 277, 348, 353, 416–21, 673–74. However, Dr. Shroff repeatedly noted

tenderness to palpation of the cervical spine at C5-C7 bilaterally, tenderness to palpation of the

left paraspinous lumbar spine at L5-S1, hip bursitis and tenderness in the left trochanteric bursa

region, and Heberden's Nodes and positive Bunnell's tests in both hands. R. 255, 259, 263, 372.

Other providers also noted tenderness to palpation of the cervical, thoracic, and/or lumbar spine,

R. 244 (Mar. 2017); R. 353 (Nov. 2016); R. 420 (Feb. 2019); mild tenderness and "discomfort"

with range of motion in the shoulder, R. 244; wrist joint and finger joint tenderness, R. 348 (May 2018); and Heberden's Nodes with arthropathy on both hands, R. 419, 421, 674 (Feb., Mar. & June 2019). In late 2017, ultrasounds of the hands and feet were "normal appearing other than mild inflammation" in the joints of all four appendages, *id.*, and Heberden's Nodes in both hands, R. 264. X-rays revealed "mild OA changes" with facet arthropathy in the cervical spine and bone spurs with degenerative narrowing at L5-51. R. 260. A CT scan taken in September 2020 showed "osteophyte formations in the thoracic and lumbar spine" with "facet arthropathy at L5-S1." R. 694.

In March 2017, Sherry reported "worsening" dull, achy pain in the muscles and joints "all over" her body. R. 241. That October, she told Dr. Shroff her lower-back pain "started about 26 years ago and [was] gradually getting worse." R. 261. This pain was "sharp at times and dull at other times." *Id.* She rated the pain as "10/10 at its worst when she stands or sits for long periods of time, and 4–5/10 at its best." *Id.* Her hands were so stiff and painful that she could not hold a blow dryer. *Id.* She rated this pain as "10/10 at its worse when she uses her hands and 4-5/10 at its best when she rests her hands." *Id.* Sherry was already "on chronic meds," namely 325 mg Tylenol, to help manage her symptoms. *See* R. 261, 264. Dr. Shroff held off prescribing more powerful analgesics until the results of Sherry's blood chemistry and inflammatory marker tests came back. R. 264. They discussed switching to an anti-inflammatory diet and using "Epsom salt soaks [or] paraffin wax soaks" to help manage the pain. *Id.* Two weeks later, Dr. Shroff started Sherry on oral diclofenac and Cymbalta for polyarthritis symptoms and fibromyalgia symptoms, respectively. R. 259. In November, Sherry told Dr. Shroff that her chronic lower-back pain was so "severe" that "she is unable to move at times." R. 253. He increased Cymbalta, administered trigger-point injections, and told her to follow up in two months or as needed. R. 255. Sherry

stopped going to Dr. Shroff's rheumatology/orthopedic clinic when she lost her health insurance. *See* R. 68 (Aug. 2019); R. 172 (June 2018); R. 346 (May 2018); R. 420 (Feb. 2019). She "tri[ed] to find another RA orthopedic doctor" to help manage her whole-body pain and stiffness, but she had trouble finding a new provider "because they're so pricey." R. 68 (Aug. 2019).

In May 2018, Sherry told Dr. Hamlor that she had "achy, throbbing" joint pain with associated stiffness in her lower-back, hands, and feet. *See* R. 346–47. He refilled her diclofenac and recommended low-impact "joint protection and energy conservation" exercises to manage chronic osteoarthritis pain. R. 349; *see also* R. 458 (Dr. Alexander's opinion that no course of medical treatment "is going to eradicate" fibromyalgia pain, but that he recommends "physical therapy to encourage integrated increased . . . range of motion" so patients can at least "cop[e] with the pain and carry[] on their daily lives as they are accustomed"). She did not have health insurance at the time. R. 346. Sherry tried to reestablish care with Dr. Shroff's clinic in October 2018. R. 370–74. She complained of "severe widespread muscle and joint pain" and stiffness that was "most severe" in her neck, back, hands, and feet. R. 370. Dr. Shroff increased her Cymbalta again and told her to return in two weeks so they could reassess her neck and back pain based on updated X-rays. *See* R. 372, 374.

In February 2019, Sherry went to GoDocs South Boston for a sick visit "to discuss her severe joint pain" and fibromyalgia symptoms affecting "most of her joints." R. 420. Her symptoms waxed and waned, but "some days . . . she can't even get up and do anything because of the pain she is in." *Id.* The provider started her on 300 mg gabapentin three times daily. R. 421. Taking gabapentin for a few weeks "help[ed] ease her widespread pain," but she still had "a lot of pain" and stiffness "in most all of her joints and her lower back." R. 418 (Mar. 2019). In March 2019, Sherry told her provider that "cleaning her house used to take 2 hours and now it

takes all day if not multiple days" because she "take[s] so many breaks from being in pain." *Id.*
The pain was still "10/10 at its worst." *Id.* By June, Sherry had "stopped taking the Cymbalta
because she did not see any help from it." R. 673. She took the gabapentin as directed, but it was
"just a temporary fix." *Id.* Sherry was "still experiencing severe joint pain" from fibromyalgia
and widespread arthritis. *Id.* The provider refilled her gabapentin and 800mg ibuprofen, gave her
a cortisone shot, and encouraged her to find a rheumatologist once her husband's new health
insurance went into effect. R. 674.

      b.    *Sherry's Testimony*

      Sherry completed an Adult Function Report in July 2018. R. 186–93. She woke up stiff
every day, sometimes cooked breakfast, and "tr[ied] to do some house work at times." R. 186;
*see also* R. 187–88, 193. She could handle her personal care "OK," but she "dress[ed] slowly"
and could not hold a curling iron or blow dryer when her hands hurt. R. 187, 190. "Every day
[could] be different," R. 186, when it comes to how much pain and stiffness limited her activity.
*See* R. 189, 193. Some days [she] can't do to[o] much," R. 186, besides lie around the house and
"watch TV [like] everyone does," R. 189–90. *See* R. 188–89, 193. Other days she could "at least
go walk in [her] yard" or go to the store. R. 193. On a "good day," she could do some "light
cleaning" like laundry, sweeping, and vacuuming. R. 188. Those chores took her "all day" to
finish because she needed to stop and rest. *Id.* Sherry fed the family's pets and cooked breakfast
or dinner a few times a week, R. 187–88, but her hands hurt too much to open cans or jars, R.
188. Her husband did almost everything else around the house. *See* R. 187–89. He walked the
dog, cooked "a lot" of their meals, and went grocery shopping. *Id.* Sherry went shopping with
him "maybe once a month," but she could not stand or sit long enough to stay out for more than
30 minutes to an hour. R. 189; *see also* R. 191, 193.

Sherry also testified at ALJ hearings in August 2019 and January 2022. *See* R. 66–77, 468–77. In 2019, she testified that she could not work anymore because her neck, back, feet, and hands "just hurt every day," R. 66. *See* R. 66–67, 69–72. She took ibuprofen and gabapentin and soaked in Epsom salts. R. 67. The cortisone shots that Dr. Shroff gave her in late 2017 helped her pain for "maybe 10 days." R. 68. Sherry "need[ed] to go back" for more treatment, but she lost her health insurance when her husband got laid off. *Id.* "[T]rying to find another RA orthopedic doctor" was proving "difficult . . . because they're so pricey." *Id.* Doctors had not recommended that she just "get out and walk and move [her] joints" because "they kind of know [she] can't" be very active with her fibromyalgia symptoms. R. 67. If she did run errands, she "can't go [for] long" before her joints were unbearably stiff and painful. R. 69–70. Her finger joints were "getting a little sideways" from the Heberden's Nodes, and it hurt too much to blow dry her hair. R. 70. On a typical day, Sherry might make an egg and toast for breakfast, let the dog into the yard a few times, walk to the mailbox, read the newspaper or listen to the radio, and put dinner in the crockpot. *See* R. 71–75. "It's kind of a boring life," she said. R. 75. Sherry could stand at the sink and wash dishes for 20 to 30 minutes before she needed to sit down. R. 76–77. Her body was stiff when she stood up from sitting. R. 73. Sherry could put laundry in the washer and dryer, but her husband carried the hamper and put their clothes away. R. 74.

Sherry described similar symptoms and functional limitations at the ALJ hearing in January 2022. *See* R. 468–77. She "feels like [her] body's bruised all over" with throbbing pain and a burning sensation, R. 469, "embedded deep down" in her joints and muscles, R. 470. *See* R. 472. She took diclofenac, which "was doing a little [to] help" her pain and soaked in Epsom salts to ease her achy muscles. R. 469. These symptoms never go away entirely. *Id.* Sherry visits her healthcare provider "as soon as . . . [she] can't deal with it anymore," which was "maybe

19

once a month." R. 472. Sherry's fear of catching COVID-19 had "a lot" to do with whether she

sought healthcare in 2020 and 2021. *See* R. 473 ("[A] lot has had to do with this Covid. I'm

terrified of catching that."). She went to the doctor when she "need[ed] some kind of help [or]

some kind of relief" from her symptoms. *Id.*

Sherry testified that living with chronic fibromyalgia pain and stiffness means having

"decent days" and "bad days." R. 471; *see* R. 468, 472. On decent days, Sherry might walk

around in her yard a little bit or walk to the mailbox 75 feet from her house. R. 471. These are

the days when Sherry can tackle "simple things" at home, like washing dishes or doing laundry,

but only if she "takes breaks throughout the day." R. 469; *see also* R. 474–75 (testifying that

there are "some days" when she can cook breakfast, wash dishes, do laundry, and clean her

home, but she must "pace [her]self" and take rest breaks). But she "can't push [her]self to do

extra . . . all-day cleaning" because she would be "down for the count . . . for a couple of days."

R. 474–75. "A lot of walking or standing or sitting makes it worse." R. 468–69. She "absolutely

cannot" do anything on the days, R. 471, when her burning pain and joint stiffness are

"unbearable," R. 469. *See* R. 468. Those are the days when she "struggle[s] to change [her]

clothes" and "hand pain makes . . . holding a cup of coffee hard." R. 472. Sherry had six or seven

bad days in December 2021. *Id.* Looking back on 2016 to 2019, she testified that her symptoms

were "getting worse as [she's] maybe getting older." R. 473. By January 2022, "some months

[were] just unbearable." *Id.* She did not use a cane or other device to help her walk. R. 477; *see*

R. 349 ("Discussed assistive devices for ambulation and activities of daily living.").

  *c.*  *The ALJ's Decision*

ALJ Moore summarized some of this evidence in her decision. *See* R. 437, 438–41. She

found that Sherry's severe degenerative disc disease, fibromyalgia, arthritis, and obesity, R. 436,

"could reasonably be expected to cause the alleged symptoms," R. 440, that Sherry described in

her July 2018 function report and January 2022 hearing testimony. *See* R. 438–39 (citing R. 186–

93, 468–77). Sherry's "statements concerning the intensity, persistence, and limiting effects of

these symptoms," however, were "not entirely consistent with the medical and other evidence in

the record." R. 440. The ALJ credited some of these statements in her RFC determination, *see* R.

438, 440, but ultimately concluded that Sherry's "symptoms and subjective complaints during

the period at issue would not prevent her from performing light work or require increased

tolerance for time off task, absenteeism, or additional unscheduled breaks," R. 441. *See* R. 442

(concluding that the RFC finding "is supported by the claimant's often sparse treatment history,

her largely unremarkable examinations and imaging, and her reported activities of daily living

during the period at issue").

      ALJ Moore gave four reasons to support her conclusion that Sherry's statements

describing disabling pain and functional limitations were not entirely consistent with other

evidence in the record. *See* R. 440–41. First, the objective medical evidence showed that Sherry

"consistently exhibited normal gait and station with full strength, range of motion, and sensation

with no signs of distress." R. 440 (citing R. 242–43, 254–55, 258–59, 348, 353, 372, 416–21).

Sherry also testified that she did not need an assistive device to walk. *Id.* (citing R. 477). Second,

Sherry's "statements regarding her ability to manage personal care independently, prepare meals,

do dishes and laundry, walk pets, shop for groceries, and do paperwork would not be consistent

with greater limitation" than what the ALJ included in her RFC determination. R. 441 (citing R.

186–93 (July 2018)); *see also id.* ("[T]he claimant's reported activities of daily living, including

cooking, cleaning, and running errands . . . support finding her capable of a range of light

work."). Third, in January 2022, Sherry testified "that her condition had worsened over time,

which suggest[ed] that she would have experienced fewer limitations between June 2016 and

December 31, 2019." *Id.* (citing R. 473). The ALJ also credited Sherry's "testimony that she

sought treatment when her symptoms became more severe, as the record show[ed] a single visit

for osteoarthritis and no treatment for fibromyalgia in 2016, limited treatment in 2017 and 2018,

and no treatment besides gastrointestinal appointments" in 2020. *Id.* (citing R. 346–56, 680–

713). Fourth, "while [Sherry] endorsed improvement with medication when compliant, she

generally declined to take medication." *Id.* (citing R. 418–20).

       2.    *Analysis*

      To past muster, the ALJ's reasons for rejecting Sherry's testimony alleging disabling

fibromyalgia pain and joint stiffness need only be legally adequate and logically supported by an

accurate recounting of the evidence she relied upon. None of them meet this deferential standard

of review. First, the ALJ could "not rely on objective medical evidence (or lack thereof)—even

as just one of multiple factors—to discount [Sherry's] subjective complaints regarding symptoms

of fibromyalgia." *Arakas*, 983 F.3d at 97. This is because objective indicators like normal exam

findings and clean diagnostic images "simply have no relevance to the severity, persistence, or

limiting effects of a claimant's fibromyalgia, based on the current medical understanding of the

disease." *Id.* "[P]hysical examinations of patients with fibromyalgia will usually yield normal

results—a full range of motion, no joint swelling, as well as normal muscle strength and

neurological reactions." *Id.* at 96 (quoting *Green-Younger v. Barnhart*, 335 F.3d 99, 108–09 (2d

Cir. 2003) (cleaned up)). They probably will not need an assistive device to walk given that their

coordination and lower-extremity strength are otherwise fine. *See Ellis v. Colvin*, No. 5:13cv43,

2014 WL 2862703, at *10 (W.D. Va. June 24, 2014). This was certainly true in Sherry's case. R.

440. Moreover, the ALJ downplayed ample evidence that Sherry exhibited central pain responses

"to minimal stimulus peripherally in various places" over her body on physical exams, R. 456;

*see, e.g.*, R. 244, 255, 259, 263, 348, 353, 372, 420, which Dr. Alexander testified were some of

the only objective abnormalities associated with fibromyalgia, R. 456–57. This was clear legal

error. *See Arakas*, 983 F.3d at 97.

Second, substantial evidence does not support the ALJ's findings about Sherry's

"reported activities of daily living," R. 441, or her conclusion that those activities were

inconsistent with Sherry's complaints of disabling pain and functional limitations, R. 440–41.

ALJs should consider relevant information about a claimant's activities of daily living ("ADLs")

as one factor in determining her RFC. 20 C.F.R. §§ 404.1529(c)(3)(i), 404.1545(a). However,

"[a]n ALJ may not consider the *type* of a claimant's activities without also considering the *extent*

to which she can perform them." *Woods*, 888 F.3d at 694. If an ALJ rejects statements describing

the limited extent of the claimant's activities, her decision must build an accurate and logical

bridge from other relevant evidence in the record to her conclusion that the qualifying statements

are not credible. *See Monroe*, 826 F.3d at 189. Additionally, the Fourth Circuit has long

"bemoaned the tendency of ALJs to overstate claimants' [RFCs] and ability to work based on

their daily activities." *Oakes*, 70 F.4th at 216 (cleaned up). "A claimant's inability to sustain full-

time work due to pain and other symptoms is often consistent with her ability to carry out daily

activities" at home. *Arakas*, 983 F.3d at 101. "The critical differences between activities of daily

living and activities in a full-time job are that a person has more flexibility in scheduling the

former than the latter, can get help from other persons, and is not held to a minimum standard of

performance, as she would be by an employer." *Id.* (cleaned up) (quoting *Bjornson v. Astrue*, 671

F.3d 640, 647 (7th Cir. 2012)). Thus, ALJs typically cannot rely on the claimant's ADLs alone to

show that she could sustain full-time work. *See* 20 C.F.R. § 404.1572(c).

23

The ALJ found that Sherry's "reported activities of daily living[] includ[ed] cooking, cleaning, and running errands" and that Sherry had admitted an "ability to manage personal care independently, prepare meals, do dishes and laundry, walk pets, drive, shop for groceries, and do paperwork." R. 441. She concluded that Sherry's "statements regarding her abilit[ies]" to do these activities, *id.* (citing R. 186–93), were inconsistent with her complaints of disabling pain. *See* R. 441–42. "This conclusion was not supported by substantial evidence because the record, when read as a whole, reveals no inconsistency between the two," *Hines*, 453 F.3d at 565. *See* R. 186–89, 191, 193 (July 2018); *accord* R. 60–70 (Aug. 2019); R. 468–75 (Jan. 2022); R. 418 (Mar. 2019). First, the ALJ's characterization of Sherry's reported ADLs describes only the type of activities she performed; it does not acknowledge Sherry's undisputed testimony that she could do those activities only on her "good" days, that it took her "all day" to do some "light cleaning" and laundry, or that her errands only took thirty minutes to an hour because she could not sit or stand for much longer than that. *See* R. 186–89, 193; *accord* R. 69–75; R. 468–75. Sherry also testified that she cannot do any of these ADLs on her "bad" days. *See* R. 186; *accord* R. 468, 471–72. Second, Sherry's *actual* "statements regarding her ability to" do the cited activities, R. 441, are not inconsistent with a conclusion that constant, severe pain and joint stiffness prevented Sherry from sustaining full-time work, *Arakas*, 983 F.3d at 101. Sherry stated that she can manage her personal care "OK," but she gets dressed "slowly" and she cannot hold a blow dryer or curling iron because her hands hurt too much. R. 187, 190. She fixes simple meals a few times a week, R. 187–88, but her hands hurt too much to open cans or jars, R. 188. She can wash a few dishes for twenty or thirty minutes at a time. Her husband walks the dog, cooks most of their meals, helps her do laundry, and goes grocery shopping. R. 187–89. Sherry goes shopping with him "maybe once a month," but only for thirty minutes to an hour. R. 189; *see*

24

*also* R. 191, 193. The ALJ accurately recounted Sherry's qualifying statements earlier in her decision, R. 438–39, but she did not explain why she rejected them when she got to the RFC determination, R. 441. *See Monroe*, 826 F.3d at 189.

Third, the ALJ did not explain how Sherry's January 2022 testimony that "her condition had worsened over time[] . . . suggests she would have experienced fewer limitations between June 2016 and December 31, 2019," R. 441 (citing R. 473). *Cf. Mitchell v. Colvin*, No. 5:15cv344, 2016 WL 3944689, at *4 (E.D.N.C. June 28, 2016) ("Stability of a particular ailment is not indicative of its seriousness or disabling characteristics."); *Hemminger v. Astrue*, 590 F. Supp. 2d 1073, 1081 (W.D. Wis. 2008) ("[A] person can have a condition that is both 'stable' and disabling at the same time."). Regardless, the ALJ's conclusion that Sherry must have had "fewer" pain-related limitations in 2016–2019 is belied by Sherry's statements describing her limitations throughout that three-year period. *See generally* R. 66–77 (Aug. 2019); R. 186–93 (July 2018); R. 241 (Mar. 2017); R. 253, 257, 261 (Oct. & Nov. 2017) R. 346–47 (May 2018); R. 370 (Oct. 2018); R. 418–20 (Feb. & Mar. 2019); R. 673 (June 2019). In March 2017, for example, Sherry reported "worsening" dull, achy pain in the muscles and joints all over her body. R. 241. That November, she told Dr. Shroff that her lower-back pain was so severe that "she is unable to move at times." R. 253. She reported similar symptoms in May 2018, October 2018, and February 2019. *See* R. 346–47, 370, 420. In March 2019, Sherry told her provider that "cleaning her house used to take 2 hours and now it takes all day if not multiple days" because she "take[s] so many breaks from being in pain." R. 418. Nothing is inconsistent between Sherry's pre-DLI statements and her post-DLI testimony that her pain and stiffness caused by fibromyalgia and degenerative arthritis, R. 455, were "getting worse" as she aged, R. 473. The ALJ failed to explain why she concluded otherwise. *See Monroe*, 826 F.3d at 189.

Finally, substantial evidence does not support the ALJ's finding that Sherry "generally declined to take medication" despite "endors[ing] improvement . . . while compliant," R. 441 (citing R. 418–20), or her conclusion that Sherry's "often sparse treatment history," R. 442, undermined her complaints of disabling pain. *See* R. 441 (citing R. 346–56, 680–713). ALJs may consider information about the claimant's treatment history, including compliance with prescribed treatment, as one relevant factor when evaluating the claimant's symptoms. *See generally Dunn*, 607 F. App'x at 273–74; 20 C.F.R. §§ 404.1529(c)(3)(iv)–(v), 404.1530(a)–(c). Before the ALJ can use that information to discount the claimant's statements, however, she must consider "other reasons" exist why treatment was not as frequent or "as aggressive as one would reasonably think would be employed" if the claimant's symptoms were "actually [as] severe" as she alleged. *Dunn*, 607 F. App'x at 275; *see also* 20 C.F.R. § 404.1530(c). For example, "[a] claimant may not be penalized for failing to seek treatment that she cannot afford." *Lovejoy v. Heckler*, 790 F.2d 1114, 1117 (4th Cir. 1986). Similarly, a claimant "cannot be faulted 'for failing to pursue non-conservative treatment options where none exist'" for her medical condition. *Arakas*, 983 F.3d at 102 (quoting *Lapeirre-Gutt v. Astrue*, 382 F. App'x 662, 664 (9th Cir. 2010)).

ALJ Moore cited two treatment notes from early 2019 to support her finding that Sherry "generally declined to take medication" despite "endors[ing] improvement . . . while compliant." R. 441 (citing R. 418–19, 420). The first simply states that Sherry was "not taking any prescribed medication right now." R. 420 (Feb. 2019). Dr. Shroff used to manage Sherry's fibromyalgia medications, but "she lost her health insurance since" she last saw him in October 2018. *Id.*; *see* R 370–72. Her new provider prescribed gabapentin at this visit. *See* R. 420–21. In March 2019, Sherry told the provider that "gabapentin helps ease her widespread pain, but . . . she continues

26

to have a lot of pain." R. 418. The provider added Cymbalta, R. 419, which Sherry agreed to try.

Thus, the cited records do not support the ALJ's findings about Sherry's medication compliance.

As to Sherry's "sparse treatment history," R. 442, the ALJ found that Sherry had "limited

treatment 2017 and 2018" and that she "sought treatment when her symptoms became more

severe," which the ALJ implied happed sometime after her DLI, R. 441 (citing R. 346–56, 680–

713). Sherry saw Dr. Shroff every two weeks in late 2017. She stopped seeing him when she lost

her health insurance. *See* R. 68 (Aug. 2019); R. 172 (June 2018); R. 346 (May 2018); R. 420

(Feb. 2019); R. 674 (June 2019). Sherry went without health insurance from at least May 2018

through June 2019, if not longer. *See id.* In August 2019, she testified that she "need[ed] to go

back" to a specialist and that "trying to find another RA orthopedic doctor" had proven "difficult

. . . because they're so pricey." R. 68. The ALJ did not acknowledge any of this evidence in her

decision. *See* R. 440–41. She also implied that Sherry failed to seek treatment for fibromyalgia

symptoms in 2019, indicating that Sherry's pain and other symptoms were not as bad as she

alleged. R. 441; *see Dunn*, 607 F. App'x at 274–75. In fact, Sherry went to Go Docs in February,

March, and June 2019 for help with her "severe joint pain" and fibromyalgia symptoms affecting

"most of her joints." R. 420; *see* R. 418–22, 673–75. The pain was still 10/10 at its worst, R. 418

(Mar. 2019), just as it had been for at least the past eighteen months, R. 261 (Oct. 2017).

To summarize, the ALJ made several legal errors when evaluating Sherry's subjective

statements. She applied the wrong legal standard by relying on generally normal physical exam

findings to discount Sherry's statements describing the intensity, persistence, and functionally

limiting effects of pain and other symptoms caused by fibromyalgia. *See Arakas*, 983 F.3d at 97.

She cherry-picked certain facts from Sherry's consistent statements describing minimal and

sporadic ADLs, misstated or mischaracterized facts about her actual treatment history, and

27

appears to have penalized Sherry for failing to seek treatment that she could not afford. *See id.* at 99; *Lovejoy*, 790 F.2d at 1117. Accordingly, substantial evidence does not support the ALJ's denial of benefits.

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** Sherry's motion for summary judgment, ECF No. 16, and **DENY** the Commissioner's motion for summary judgment, ECF No. 22; **REVERSE** the Commissioner's final decision denying Sherry's DIB claim; **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g); and **DISMISS** this case from the Court's active docket.

### <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 5, 2024

Joel C. Hoppe

United States Magistrate Judge